UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**JADENE MAYLA FOURMAN**,                              Case No. 3:15-cv-01011-KI

　　　　　　　Plaintiff,                              OPINION AND ORDER

　v.

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security**,

　　　　　　　Defendant.

　　　Mark A. Manning, Esq.
　　　474 Willamette, #200
　　　Eugene, Oregon 97401

　　　Howard D. Olinsky, Esq.
　　　Olinsky Law Group
　　　One Park Place
　　　300 South State St., Ste. 420
　　　Syracuse, NY 13202

　　　　　　Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

Billy J. Williams
United States Attorney
District of Oregon
Janice E. Hebert
Assistant United States Attorney
1000 SW Third Ave., Ste. 600
Portland, OR 97204-2902

Gerald J. Hill
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

      Attorneys for Defendant

KING, Judge:

      Plaintiff Jadene Fourman brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I affirm the decision of the Commissioner.

## BACKGROUND

      Fourman filed applications for DIB and SSI in November 2011, alleging disability

beginning February 28, 2010.  The applications were denied initially and upon reconsideration.

After a timely request for a hearing, Fourman, represented by counsel, appeared and testified

before an Administrative Law Judge ("ALJ") on October 10, 2013, at which time she

unsuccessfully attempted to amend her alleged onset date of disability to March 2006.

      On October 25, 2013, the ALJ issued a decision finding Fourman not disabled within the

meaning of the Act and therefore not entitled to benefits.  This decision became the final decision

Page 2 - OPINION AND ORDER

of the Commissioner when the Appeals Council declined to review the decision of the ALJ on

April 7, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits

to people who have contributed to the Social Security program and who suffer from a physical or

mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security

income benefits may be available to individuals who are age 65 or over, blind, or disabled, but

who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

cause death or to last for a continuous period of at least twelve months.  42 U.S.C.

§§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his

physical or mental impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and

1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for

determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is

carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  *Parra v.*

*Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ

determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§

404.1520(b) and 416.920(b).  If the claimant is engaged in such activity, disability benefits are

denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  *Parra*, 481 F.3d at 746.  The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir.

2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance.  *Id.* (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations.  *Id.*

## THE ALJ'S DECISION

The ALJ found Fourman met the insured status requirements through June 30, 2013, and

had not engaged in substantial gainful activity since February 28, 2010.  He identified her severe

impairments as:  scoliosis, posttraumatic stress disorder ("PTSD"), and dissociative disorder.

The ALJ found these impairments, either singly or in combination, did not meet or medically

equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix

1.  Given these impairments, the ALJ concluded Fourman can perform work at all exertional

levels, but that she would require the following limitations:  she can only sit for one and a half

hours at a time, at which time she would need to change positions to stretch; she should have

only incidental public contact; she cannot work as part of a team; and she is unable to perform

production paced work.  Given these limitations, the ALJ concluded Fourman cannot perform her

past relevant work, but that she can perform other work in the national economy, including

laundry folder and garment sorter.  As a result, Fourman was not disabled within the meaning of

the Act.

## FACTS

Fourman was 39 years old at the time of the hearing. She had obtained her B.A. in writing from Oregon State University, and a second B.A. in landscape architecture from the University of Oregon. At the time of the hearing, she was enrolled in a Master of Fine Arts program at the Pacific Northwest College of Art/Oregon College of Art and Craft.

Fourman obtained counseling services from several providers through LifeWorks from September 2010 through November 2012. She first sought treatment from Bridget O'Neill, at which time she described a very challenging and abusive childhood. She was unemployed but looking for work, and reported her business, which had been successful for about four years, had just gone under. O'Neill thought Fourman qualified for a diagnosis of PTSD. From the beginning, Fourman informed O'Neill she was not interested in prescription medications and was exploring alternative healing methods. O'Neill thought Fourman's prognosis was good.

September 2010 was difficult for Fourman, but she reported "feeling pretty good" about a social situation in October and "doing fairly well" in November. Tr. 568, 565. She was depressed in December, but her "thoughts and thought processes were clear, thoughtful and coherent." Tr. 562. She did not make her February or March 2011 appointments. Fourman felt "increased clarity" in her social interactions by April 2011, and she expressed interest in trauma group and art therapy.

Beginning in April 2011 until June 2012, Fourman obtained art therapy from Serena Appel, M.A. Fourman told Appel she was doing "relatively okay at the moment" at their first session, although she was considering applying for disability because she felt her symptoms, such as derealization/dissociation, made it difficult for her to keep jobs. Fourman felt depressed, with

some suicide ideation, in May 2011, but she declined medications and was taking herbal supplements instead.  Fourman attended a few group therapy sessions but then dropped out of the group without discussing it with Appel.  Fourman decided to proceed with individual sessions only.  Fourman met with Appel once in June, once in July, and then began attending sessions twice a month beginning in September.  At these sessions, Fourman discussed ways to improve and develop social contacts and friendships, improve her sleep hygiene, strengthen her relationship with her boyfriend, and focus on healing.  She reported feeling "fairly stable," and she discussed seeing a spiritual healer to deal with her bad energy.  Tr. 517.  At her July session, she noted confusion finding the location, even though she had been there several times, and she mentioned feeling depressed and wondered about moving to another city.  She decided to "de-emphasiz[e] [her] work search for the moment" in September.  Tr. 506.  In October, Fourman disclosed being involved in a lot of activities and needing help simplifying and committing to only certain activities.  Appel completed the mental evaluation form for Fourman's disability application by discussing Fourman's symptoms with her in November 2011.  Tr. 408-10.  Appel commented, "I suggested she might use this information to help her determine what types of jobs she might want to apply to."  Tr. 494.

By January 2012, Fourman reported training for a potential new job as a financial advisor, which would require her to network and retain clients.  Fourman had obtained her license to perform financial advising, she was juggling "3 different careers and several volunteer opportunities or projects" and needed help scheduling down time in February and March.  Tr. 670.  Fourman discussed ways to organize her work in May and June, since she was "working 2 primary jobs between financial consulting, plus her landscaping business."  Tr. 658.

Page 7 - OPINION AND ORDER

Fourman switched providers in August, obtaining counseling from Nicole Warren, LPC. At her first appointment, Fourman explained she did not want to perform the financial consulting work any longer, but wanted to operate her own business. In responding to Warren's question in October about how her symptoms interfered with her life, Fourman responded "in all areas." Tr. 647. At the next session, in November 2012, when Warren questioned her about qualifying for disability, Fourman spent the time describing past experiences of being fired. Warren asked if her difficulties were workable in an attempt to redirect her, but Fourman left the session stating "people don't understand me." Tr. 645. Fourman did not return to LifeWorks.

During some of this time, Fourman overlapped her individual therapy sessions with monthly couples counseling, attending sessions with Amy Berg, PhD, LMFT, from February 2012 through February 2013. Berg worked with both Fourman and her boyfriend on their relationship, particularly on the need for quality time and communication. At one point, in April 2012, Fourman reported working approximately 60 unpaid hours as a financial advisor in training. Tr. 689. In June, Fourman reported being "very busy" working as a financial advisor and at her landscape design business "that is growing." Tr. 687. Berg agreed to fill out paperwork related to Fourman's disability application in October 2012, noting "Fourman has lost several jobs over the past years due to PTSD [symptoms] including confusion, errors, communication difficulties, hypervigilance, physiological reactivity, efforts to avoid triggers in customer service, dissociation when anxious, feelings of detachment and estrangement, irritability, exaggerated startle response, etc." Tr. 684. In November, Fourman "expressed anger at her individual therapist for declining to complete disability paperwork and persuaded her to do so." Tr. 683. At this time, Fourman was "focusing on jewelry making, landscaping, and

Sustainability for Kids businesses." Tr. 683.  Fourman continued to express an interest in

making and selling jewelry in January 2013.

Fourman established medical care through Multnomah County Health Department in

February 2011.  She sought contraception in February 2011, at which time she reported to Leslie

Gregory, P.A., having "been well save a bit of insomnia." Tr. 397.  When she returned for a

routine gynecologic exam in June 2011, she reported experiencing aching in her shoulders and

chest from her history of abuse.  She met Valerie Krause, M.D., for the first time in November

2011, and asked for completion of disability forms at that time.  Fourman described her history of

being fired four times due to PTSD symptoms.  Dr. Krause discussed Fourman's symptoms with

her and agreed to document them for her disability case.  The doctor opined, "Her [symptoms]

certainly sound chronic and disabling to prevent her from maintaining competitive employment."

Tr. 392.  Fourman saw Dr. Krause again in December 2011.  Fourman presented as:  "Pleasant.

Mood fair.  Affect calm.  Speech clear, [regular rate and rhythm]." Tr. 390.  After talking with

her about her symptoms, including distorted hearing, needing to be against a wall, difficulty

speaking, and hyper-vigilance, Dr. Krause assessed PTSD and opined her "[d]isabling symptoms

. . . certainly would cause her to be unable to maintain competitive employment." Tr. 390.  She

completed a mental capacity form.

Dr. Krause treated Fourman on three other occasions, once in February 2012 to discuss a

mole, and the need for a different counselor than the Lifeworks counselor, once in November

2012 to discuss a lump on Fourman's cervix, and once in December 2012 to assess painful ribs

and depression around the holidays.  Altogether, Dr. Krause advocated for Fourman's disability

on three occasions, drafting letters and completing forms in December 2011, in November 2012,

and again in September 2013.

## DISCUSSION

Fourman challenges the ALJ's determination of her credibility and the ALJ's treatment of

the opinion evidence.

I.    <u>Fourman's Credibility</u>

Fourman testified she was living by herself, enrolled in the MFA program with the "goal .

. . to try to get a job some day to try to get credentials that will make me more employable," and

living off of student loans.  Tr. 46.  Her school schedule involved classes two days a week and

then setting up her own practice on the other days, so that she was busy every day including

weekends.  She testified things were going "okay," although a teacher had spoken to her and she

was attending counseling to deal with conflicts with other students.  Tr. 49.  She stopped working

as a financial advisor because she felt anxious and a lot of pressure to bring in clients.  She never

received enough money from her landscape business to make a living.  She was fired from a job

where she had to read from a script over the phone; she was told she had been rude, and that she

had called and hung up on a member twice in one day.  She reported performing regularly with a

dance troupe; the group broke up because of friction among group members.  She participated in

a kickball group, but left because she felt like an outsider.  She thought she could not work full

time because "of my past experience with being fired from jobs because of my disability and not

understanding how to fix what I was being told I was doing wrong."  Tr. 57.  She thought she

could not perform work where she did not have to deal with other people because, "I have

extreme anxiety and a fear, and I don't know how that would play out."  *Id.*  She explained that

while she had initially told a counselor she wanted children, she realized through counseling that her desire was wrongly motivated by a need to have people in her life.  She also testified that scoliosis made sitting for long periods difficult.

The ALJ found Fourman experienced symptoms from her impairments, but they did not preclude her from engaging in all work activity as she had alleged.  The ALJ noted that Fourman's scoliosis was mild and her medical records did not reveal complaints or treatment for her back pain; when she obtained a new bed, she noted improvement.  The ALJ commented that Fourman has not been psychiatrically hospitalized or required in-patient treatment, she had never been prescribed psychiatric medications, and her treatment had been limited to psychotherapy which had improved her symptoms.  In addition, Fourman worked only sporadically well before her onset date of disability, "which raises questions as to whether the claimant's continuing unemployment is actually due to her medical impairments." Tr. 30.  The ALJ also pointed to Fourman's financial consulting work, as well as her landscaping business, her interest in making jewelry and in establishing a sustainability business for kids, as examples of how Fourman is not as debilitated as she alleged.  Her willingness to accrue $150,000 loans also suggested to the ALJ that Fourman believed she would work some day. He viewed her desire for children as an indication she had the ability to care for them.  Further, her activities, including laundry, house cleaning, driving, grocery shopping, participating in a dance troupe, juggling careers and volunteer opportunities, and attending graduate school full time, all suggest she is capable of working jobs consistent with the RFC.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective

medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. *Id.* The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. *Id.* "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).[1]

Fourman argues the ALJ did not support his reasoning with clear and convincing reasons supported by substantial evidence in the record. She suggests her PTSD symptoms likely began early in her life and caused her spotty work history. She also disputes that her decision to accrue student loan debt should be a reason to conclude she plans to work, or is capable of working some day. She disagrees that her desire to have children should be held against her. Finally, she disagrees that her daily activities suggest she is not as disabled as she testified to being.

---

[1] The Commissioner suggests a more deferential standard may apply, citing *Molina*, 775 F.3d at 1136 for the proposition that merely reasonable conclusions drawn from the evidence suffice. Def.'s Br. 5, n.4. I decline to accept the Commissioner's argument. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

While I agree with Fourman that her desire to have children should not weigh one way or the other in this credibility analysis, the remaining reasons are clear and convincing and are supported by substantial evidence in the record. Fourman's level of activity even after applying for disability is the strongest support for the ALJ's determination that she can perform work consistent with the RFC. Six months after applying for disability, Fourman was learning the financial consulting business, working 60 hours a week at one point, while maintaining her landscaping business. At other times, she focused on her jewelry making, landscaping, and developing a sustainability business for kids. She worked and volunteered. She cared for herself, participated in a dance troupe, and later attended graduate school full time. All of these activities contradict Fourman's assertion that her symptoms and limitations preclude her from working.

Additionally, while one interpretation of her spotty work history could be that she suffered from her mental illness earlier than she alleged in her disability application, the fact that she earned at substantial gainful activity levels in only four years and had no earnings in two years of the fifteen years prior to her alleged onset date could, as the ALJ stated, "raise[] questions as to whether [Fourman's] continuing unemployment is actually due to her medical impairments." Tr. 30. While not a compelling reason, the ALJ's inclination to question Fourman's credibility on this basis was a reasonable one. *See Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) (upholding ALJ's credibility analysis where ALJ's interpretation of the evidence was rational). Similarly, the ALJ rationally concluded Fourman's decision to accrue thousands of dollars of student loan debt suggests Fourman believes she is capable of working. This conclusion is consistent with Fourman's own testimony that her "goal is to try to get a job

someday to try to get credentials that will make me more employable[,]" which is why she

enrolled in graduate school.  Tr. 46.  As the Commissioner argues, it would be an unreasonable

inference to conclude Fourman incurred this debt and never intended to repay the money.

Finally, the ALJ properly considered the medical record.  While the form of treatment

(and whether it is routine and/or conservative) is not a particularly compelling reason to find

Fourman's testimony about her symptoms questionable, especially given that no physician

recommended more intense treatment, counseling notes demonstrated her trajectory towards

improvement.  Her lack of treatment for her scoliosis also supports the ALJ's conclusion about

Fourman's physical limitations.  The ALJ reasonably concluded Fourman's medical record did

not support the level of limitation she reported, and this is a clear and convincing reason to

question Fourman's testimony.

In short, the ALJ provided clear and convincing reasons supported by substantial

evidence in the record, and I will not "engage in second-guessing."  *Tommasetti v. Astrue*, 533

F.3d 1035, 1039 (9ᵗʰ Cir. 2008) (citation omitted).

II.    Medical Evidence

Fourman challenges the ALJ's decision to give great weight to the opinion of consultative

examiner, Jane Starbird, Ph.D., over the opinions of Fourman's treating providers.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician.  More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual.  *Orn v. Astrue*, 495 F.3d 625, 632 (9ᵗʰ Cir. 2007).  If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons. *Id.* (treating physician); *Widmark v. Barnhart*, 454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F.3d at 632; *Widmark*, 454 F.3d at 1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician. *Widmark*, 454 F.3d at 1066 n.2.

      A.    <u>Dr. Starbird</u>

Dr. Starbird examined Fourman in February 2012. She also reviewed Appel's mental capacity assessment, chart notes from Multnomah County Health Department, and Fourman's function report. In her interview, Fourman described her work history, including being fired from two jobs for her communication style with supervisors, co-workers, and clients. Tr. 592, 328 (corrections to report: fired from Fund for Public Interest Research and fired from landscape design business). She reported looking for work, but felt fearful about her performance and her treatment by supervisors. Fourman presented with a depressed mood, she was intense when speaking, she was a good historian, and there was no evidence of a thought disorder, psychotic processes or bizarre mentation. Her social skills were variable. Her concentration was good, but her speech was fast paced and excessive at times. Dr. Starbird diagnosed PTSD. Dr. Starbird opined,

> She expresses a strong motivation to reduce the severity of her symptoms and better understand her past problems with interactions at work sites. Because of her motivation to improve and because she describes competency in performing all day to day chores, including pursuing hobbies and pleasurable activities, it is

this examiner's opinion that she may, in the future, reduce her symptoms such that the diagnosis does not apply.

Tr. 595.

The ALJ gave Dr. Starbird's opinion great weight, finding it to be consistent with the treatment notes demonstrating improvement in Fourman's symptoms and the routine, conservative treatment she received for her symptoms.

Fourman argues the ALJ misinterpreted Dr. Starbird's opinion to be a reflection on Fourman's ability to work when Dr. Starbird did not discuss any work-related limitations. Fourman interprets the doctor's assessment to be an "equivocal prognosis[.]" Pl.'s Mem. 13.

The implication from Dr. Starbird's opinion is that Fourman did not have any limitations caused by her PTSD. In fact, Dr. Starbird suggested Fourman may not have symptoms from her PTSD *at all* if she continued to improve. The ALJ's interpretation is rational that, contrary to the state agency non-examining consultants' opinions, Fourman continues to carry a diagnosis of PTSD which constitutes a severe impairment, but Fourman's symptoms continue to improve such that she is able to perform work consistent with the RFC.

B.    Dr. Krause

Dr. Krause opined on multiple occasions that Fourman could not work. Specifically, in December 2011, Dr. Krause described Fourman as hyper-vigilant, forgetful, needing to write everything down, and easily overwhelmed. She thought Fourman would miss work more than four days a month due to exhaustion. In addition, others perceived Fourman as rude, causing her to lose jobs. Tr. 471-72. As a result, she concluded Fourman would demonstrate extreme, marked or moderate limitations in almost all areas of job performance, including understanding,

Page 16 - OPINION AND ORDER

memory, concentration, persistence, and social interactions.  Tr. 475-77.  Dr. Krause changed

some of these findings in her November 2012 assessment, concluding, for example, that

Fourman would demonstrate only a slight limitation in carrying out short and simple instructions,

rather than the moderate limitation the year before.  Tr. 609-611.  Nevertheless, Dr. Krause

repeated her finding that Fourman would have extreme limitations in performing activities within

a schedule, maintaining regular attendance, and being punctual, or completing a normal workday

without interruptions from psychologically based symptoms.  Dr. Krause's accompanying letter

indicated Fourman had been fired from jobs due to her PTSD-related symptoms and that she had

"no insight into these social behaviors and manners of social interactions . . . . As much as she

tries, she has not been able to improve or overcome these issues."  Tr. 616.  Dr. Krause reiterated

these opinions in her September 2013 letter.

The ALJ was required to give specific and legitimate reasons to support his decision to

weigh Dr. Krause's opinion less than the opinions of Dr. Starbird and the non-examining agency

consultants.  *Widmark,* 454 F.3d at 1066-67 (specific and legitimate standard when nontestifying

state agency doctor contradicts opinion of examining doctor).  The ALJ found Dr. Krause's

opinions did "not square with treatment notes showing improvement in symptoms" and he

thought Dr. Krause overly relied on Fourman's reporting of her symptoms.  Tr. 28.  He noted,

too, that the doctor's opinions were inconsistent with Fourman's "fairly robust activities of daily

living, educational history and routine conservative treatment for her mental health

impairments."  *Id.*

Fourman disputes the ALJ's reasons for giving less weight to Dr. Krause's opinions.

Fourman disagrees that Dr. Krause's opinion should be discounted for relying on Fourman's self-

reports since psychiatric disorders are diagnosed that way and since there are no objective means of determining the extent of a mental illness.  Additionally, Fourman disagrees that the kind of treatment she received--regular counseling sessions, which is the method required to treat PTSD--should undermine Dr. Krause's opinions.  Instead, Fourman argues, the ALJ should have considered Dr. Krause's letters which support her opinions about Fourman's limitations.  She also contends the opinions of Appel and Berg also support Dr. Krause's opinions.

The ALJ did not err in his analysis.  The ALJ was entitled to question Dr. Krause's opinions which were "based to a large extent on a claimant's self-reports that have been properly discounted as incredible." *Tommasetti*, 533 F.3d at 1041; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) (upholding ALJ's decision that doctor's diagnoses of mental conditions could be rejected for being based on subjective complaints).  Dr. Krause saw Fourman on two occasions before offering an opinion on her limitations, and on neither occasion did Dr. Krause perform any kind of mental capacity examination or record her own clinical observations consistent with the opinions she gave about Fourman's functional limitations.  Further, Fourman's counseling records reflected her improvement and, as a result, the doctor's opinions did "not square with the treatment notes[.]"  Tr. 28.  Fourman's level of activity, too, was inconsistent with Dr. Krause's conclusions that Fourman demonstrated impaired understanding and memory, and an inability to complete a normal workday and workweek.  Finally, although Appel and Berg's opinions were consistent with Dr. Krause's, the ALJ gave germane reasons to reject these other source opinions and Fourman does not challenge those reasons.  *See Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th Cir. 2010) (ALJ may reject the opinions of

such other sources by giving reasons that are "germane" to that source).  The ALJ supported with specific and legitimate reasons his decision to give Dr. Krause's opinions little weight.

III.    Residual Functional Capacity

Fourman argues that since Dr. Starbird did not analyze Fourman's limitations in a function-by-function manner, and since Dr. Starbird's is the only medical opinion on which the ALJ appears to have relied, the ALJ's RFC determination is unsupported by medical evidence.

Hypothetical questions posed to a vocational expert must specify all of the limitations and restrictions of the claimant.  *Edlund v. Massanari*, 253 F.3d 1152, 1160 (9th Cir. 2001).  If the hypothetical does not contain all of the claimant's limitations, the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy. *Id.*  "The limitation of evidence in a hypothetical question is objectionable only if the assumed facts could not be supported by the record."  *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989) (citations and quotations omitted).  Here, the ALJ's RFC, limiting Fourman to jobs requiring only incidental public contact, no teamwork, and no production paced work, is supported by Fourman's treating records, daily activities, and the state agency consultants' opinions which the ALJ tempered to make more protective of Fourman.  The ALJ did not err.

**CONCLUSION**

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

///

///

IT IS SO ORDERED.

DATED this ____18th____ day of April, 2016.


                                   __/s/ Garr M. King_____
                                   Garr M. King
                                   United States District Judge